## IN THE UNITED STATES DISTRICT COURTB
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| BRANDON TRAVANTIA GARRETT, | Case No.: 8:25-cv-00054 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| EXPERIAN INFORMATION SOLUTIONS, INC.; EQUIFAX INFORMATION SERVICES, LLC; TRANS UNION LLC | |
| Defendants. | |

## <u>COMPLAINT</u>

Brandon Travantia Garrett ("Plaintiff" or "Mr. Garrett") brings this action on an individual basis, against Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax"), Experian Information Solutions, Inc. ("Defendant Experian" or "Experian"), and Trans Union, LLC ("Defendant Trans Union" or "Trans Union") (collectively "Credit Bureau Defendants or Defendants") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendant's mixing/merging Plaintiff's credit file with another consumer.

**INTRODUCTION**

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7. Congress made the following findings when it enacted the FCRA in 1970:

> (a) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.
>
> (b) An elaborate mechanism has been developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy.

15 U.S.C. § 1681(a) (1-4).

8.      Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item

as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are managed in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.     "Mixed files" create a false description and representation of a consumer's credit history.

17.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.     Mixed files are not a new phenomenon. The Credit Bureau Defendants have been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently

cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.    More recently, the Credit Bureau Defendants have been the subject of numerous state attorney general actions relating to its mixed file problem.

20.    Notwithstanding the Credit Bureau Defendants' notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

21.    Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

22.    The Credit Bureau Defendants have been sued thousands of times wherein an allegation was made that such a Defendant violated the FCRA. Moreover, the Credit Bureau Defendants are sued, at a minimum, hundreds of times each year, wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

23.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

24.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including the Credit Bureau Defendants, to review their procedures when a mixed file occurs.

25.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

26.    Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants mixed and/or merged Plaintiff's credit file with that of another consumer, his twin brother.

27.    Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

28.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Credit Bureau Defendants for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

29.     Brandon Travantia Garrett ("Plaintiff" or "Mr. Garrett") is a natural person residing in Tampa, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

30.     Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia 30309, and is authorized to do business in the State of Florida, including within this District. Equifax can be served at its registered agent at Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

31.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

32.     Defendant Experian Information Solutions, Inc. ("Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California, 92626 and is authorized to do business in the State of Florida, including within this District. Experian can be served at its registered agent at CT Corporation System, 330 North Brand Blvd, Glendale, California, 91203.

33.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

34.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois, 60661 and is authorized to do business in the State of Florida, including within this District. Trans Union can be served at its registered agent at Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

35.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

37.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## **FACTS**
### **Summary of the Fair Credit Reporting Act**

38.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

39.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

40.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

41.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

42.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### The Credit Bureau Defendants' Processing of Credit Information

43.    The Credit Bureau Defendants regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

44.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

45.    The Credit Bureau Defendants collect information from thousands of furnishers.

46.    The process by which the Credit Bureau Defendants receive, sort, and store information is largely electronic.

47.     Furnishers report credit information to the Credit Bureau Defendants through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

48.     The Credit Bureau Defendants take credit information reported by furnishers and create consumer credit files.

49.     Each Credit Bureau Defendant maintains credit files on more than 200 million consumers.

50.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## The Credit Bureau Defendants' Mixed File Problem

51.     The Credit Bureau Defendants know that different consumers have similar names.

52.     The Credit Bureau Defendants know that different consumers can have similar Social Security numbers.

53.     The Credit Bureau Defendants know that different consumers with similar names can also have similar Social Security numbers.

54.     The Credit Bureau Defendants know that public records often do contain identifying information such as Social Security numbers or dates of birth.

55.     The Credit Bureau Defendants match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

56.     The Credit Bureau Defendants accomplish this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

57.     From time to time, the Credit Bureau Defendants' matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the credit reporting industry as a mixed or merged credit file.

58.     The Credit Bureau Defendants' procedures for matching consumer information to a consumer report often cause the mixing of one consumer with another. Or worse yet, the merging of data pertaining to two different consumers into a single consumer file.

59.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers apply for credit, housing, insurance, or employment, and a Defendant sells information pertaining to

one consumer in response to the application of the other. This violates the consumers' privacy and also greatly increases their risk of identity theft.

60.    With a merged file, wherein the Defendant assumes two different consumers are the same person and entitled to one file, the data pertaining to both of those consumers are comingled and piled into a single file, forcing two consumers to share a file unbeknownst to them. In this scenario, at times, the Defendant will refuse to sell a consumer report to a third party in response to a consumer application for credit or otherwise, thereby frustrating that consumer's access to credit. Or the Defendant will sell a consumer report reflecting the data pertaining to both consumers.

### The "Mixed File" Problem is Known to the Credit Bureau Defendants

61.    Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the Credit Bureau Defendants, regarding its significant failures and deficiencies with respect to mixed files.

62.    The Credit Bureau Defendants mix files even though every consumer has unique personal identifying information, such as a Social Security number. That is so because the Credit Bureau Defendants' system allows information to be

included in a consumer's file when the Social Security number reported with the information is different from the Social Security number on the consumer's file.

63. The Credit Bureau Defendants know that its matching procedures are causing inaccurate consumer reports, consumer disclosures, mixed files, and merged files.

64. Despite the Credit Bureau Defendants' long-standing and specific knowledge of the mixed and merged file problem, the Credit Bureau Defendants still mixed and/or merged Plaintiff's file with that of another consumer.

65. A mixed or merged credit file is the result of the Credit Bureau Defendants' inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

66. There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by the Credit Bureau Defendants to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

67. The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to the Credit Bureau Defendants.

68.    A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to a Defendant.

69.    Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

70.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

71.    In the 1990's, the Federal Trade Commission ("FTC") sued the Credit Bureau Defendants because of their failure to comply with the FCRA including the mixing of consumers' files.

72.    In the 1990's, the Attorneys General of numerous states sued the Credit Bureau Defendants because of their failure to comply with the FCRA including the mixing of consumers' files.

73.    In 1991, Defendant Experian's predecessor, TRW, signed a Consent Order with the FTC. To prevent the occurrence or reoccurrence of a mixed file, TRW agreed to use, for matching and identification purposes, a consumer's full identifying information, defined as full first and last name, full street address, zip code, birth year, any generational designation and social security number.

74.    In 1992, Defendant Trans Union signed a Consent Order with the Attorneys General of 17 states. Defendant Trans Union agreed that it would maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. For example, procedures during the reinvestigation process include, assigning mixed file cases to Senior Investigators who, as appropriate, must pull all files related to the consumer, fully verify disputed information, make any changes, deletions or additions to correct the file and resolve the dispute, and prepare a summary of the problem to be filed with another department for corrective action.

75.    In 1992, Defendant Equifax signed an Agreement of Assurances with the State Attorneys General and agreed to take specific steps to prevent the occurrence of mixed files and to adopt procedures designed specifically to reinvestigate consumer disputes resulting from mixed files.

76.    In 1995, Defendant Equifax signed a Consent Order with the FTC. Defendant Equifax agreed it would follow reasonable procedures to assure the maximum possible accuracy of the information on a consumer's file including, but not limited to, procedures to detect logical errors prior to reporting information on a consumer's file, procedures to prevent mixing as a result of data entry by third parties when the third party requests a consumer's report, and procedures during a reinvestigation specifically designed to resolve consumer disputes related to a mixed file.

77.    To prevent the occurrence of a mixed file, the Credit Bureau Defendants entered into agreements not to place information in a consumer's file (other than certain public record information) unless it has identified such information by at least two of the following identifiers: (i) the Consumer's name; (ii) the Consumer's Social Security number; (iii) the Consumer's date of birth, or (iv) the Consumer's account number with a Subscriber or a similar identifier unique to the Consumer.

78.    The Credit Bureau Defendants continue to repeatedly mix consumers' files despite agreements with the FTC and State Attorneys General and hundreds of lawsuits filed against them by consumers whose files have been mixed.

79.    When those lawsuits have gone to trial, juries have found that the Credit Bureau Defendants, willfully violated the accuracy and reinvestigation requirements of the FCRA - §§ 1681e(b) and 1681i – and awarded punitive damages as high as $18 million. Yet the "mixed file" problem continues.

80.    For example, in 2015, the New York Attorney General filed charges and settled claims with the Credit Bureau Defendants over mixed files.[1] *See in the Matter of Eric T. Schneiderman, Attorney General of the State of New York v.*

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag
ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

*Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

81.     Defendant Equifax's matching logic mixed two consumers' files when only seven out of the nine digits of the two consumers' Social Security numbers matched. *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1224 (D.N.M. 2006).

82.     In 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Defendant Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

83.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

84.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, the Credit Bureau Defendants continue to mix consumers' credit files with other consumers' credit files.

85.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), aff'd in part, vacated in part, rev'd in part sub nom. *Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, the Credit Bureau Defendant continues to mix consumers' credit files with other consumers' credit files.

86.     The Credit Bureau Defendants have been sued thousands of times wherein an allegation was made that the Credit Bureau Defendants violated the FCRA.

87.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

88.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

89.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

90.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies to review their procedures when a mixed file occurs.

91.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

### Plaintiff's First Encounter with His Mixed/Merged File Issue

92.    In or around March 2022, Hancock Whitney Bank ("HW Bank") closed Plaintiff's credit card account after incorrectly being flagged as fraudulent.

93.     HW Bank explained to Plaintiff that they believed Plaintiff's brother had used Plaintiff's information to open the account, which is not true.

94.     Plaintiff tried to explain that the credit card account was his, but HW Bank had already made its decision and would not help Plaintiff.

95.     Plaintiff and his brother's, Brendon Lavantia Garrett ("Mr. Lavantia Garrett"), Social Security numbers are one digit off. Plaintiff and his brother are twins, and therefore, share the same birthdate.

96.     Upon information and belief, Plaintiff and his twin brother's credit files were merged and mixed.

97.     Plaintiff was not aware that there were any issues with his credit reports at this time.

**Plaintiff and his Twin Brother are Victims of a Mixed/Merged File and Both Plaintiff, and his Twin Brother were Denied Auto Loans as a Result**

98.     On or about October 3, 2023, Mr. Lavantia Garrett applied for an auto loan with FSU credit Union to refinance his truck.

99.     Shortly thereafter, Mr. Lavantia Garrett was denied because Defendant Equifax sold a consumer report to FSU Credit Union stating that it was "unable to locate" his credit file.

100.    After investigating by reviewing his credit reports from the Credit Bureau Defendants, Mr. Lavantia Garrett confirmed that Defendant Equifax mixed/merged his credit file with that of Plaintiff.

101.   Mr. Lavantia Garrett informed Plaintiff that their credit files were being mixed/merged by not only Defendant Equifax, but by Defendant Experian and Defendant Trans Union as well. Mr. Lavantia Garrett explained to Plaintiff that his credit reports from all three Credit Bureau Defendant included Plaintiff's personal information, including, but not limited to, Plaintiff's HW Bank Account ending in account number xxxxxxxxxxxx7071.

102.   Plaintiff was shocked and dismayed upon learning that his credit file was being mixed/merged with that of his brother's. Plaintiff reasonably believes that the inaccuracies stemming from the mix/merge of his credit file(s), which were created and maintained by the Credit Bureau Defendants, were the reason his HW Bank account was closed and the reason why he has been unable to obtain a credit card and/or keep one open for a significant period of time.

**Plaintiff Discovers Multiple Instances on his Equifax Credit Report where his Twin Brother Mr. Lavantia Garrett's Information was Merged/Mixed**

103.   On or about November 2, 2023, Plaintiff received and reviewed his Equifax credit report dated November 2, 2023.

104.   In reviewing his credit report from Defendant Equifax, Plaintiff discovered multiple instances where his twin brother Mr. Lavantia Garrett's information was being reported on his credit report (the "Mixed Information").

105.   Specifically, Defendant Equifax was reporting the following accounts which do not belong to Plaintiff, including, but not limited to:

(a)    Capital One
       Account no. ending in 2343
       Opened: June 7, 2021
       Account Type: Credit Card

(b)    Elan Financial Services
       Partial Acct # 414776938366…
       Opened: June 2023
       Account Type: Credit Card

(c)    Exeter Finance LLC
       Partial Acct # 6806814486669…
       Opened: May 2021
       Type: Auto Loan
       Credit Limit or Original Amount: $34,118

(d)    Farmer's Home Furniture
       Partial Acct # 37482…
       Opened: Jan 2020
       Type: Sales Contract
       Credit Limit or Original Amount: $2,021

(e)    Farmer's Home Furniture
       Partial Acct # 37522…
       Opened: August 2021
       Type: Sales Contract
       Credit Limit or Original Amount: $1,231

(f)    Farmer's Home Furniture
       Partial Acct # 37540…
       Opened: June 2022
       Type: Sales Contract
       Credit Limit or Original Amount: $4,698

(g)    Williams and Fudge Inc.
       Original Creditor: Tallahassee Community College
       Date Assigned: September 18, 2019
       Account Type: Collection
       Account Balance: $412

106.   Upon information and belief, all of the foregoing accounts belong to Plaintiff's twin brother Mr. Lavantia Garrett and are the product of the mixed/merged file issue.

107.   In addition, the November 2, 2023, Equifax consumer report also inaccurately included a plethora of collection accounts related to medical services and student loan accounts that do not belong to Plaintiff. Upon information and belief, the medical collection and loan accounts belong to Plaintiff's twin brother Mr. Lavantia Garrett.

108.   Moreover, the November 2, 2023, Equifax consumer report included Mr. Lavantia Garrett's address in Havana, Florida.

109.   Furthermore, Defendant Equifax also included in its consumer report concerning Plaintiff incorrect employment information indicating that Plaintiff previously worked at Donald L Tucker Civi.

110.   Defendant was also reporting hard inquiries for FSU Credit Union dated October 3, 2023, Farmer's Home Furniture dated June 3, 2022, and FSU Credit Union dated April 4, 2022, which did not belong to Plaintiff, but rather belonged to Plaintiff's twin brother Mr. Lavantia Garrett.

111.   Based on the foregoing, Defendant Equifax Merged/Mixed Plaintiff's credit file with his twin brother's credit file.

112.   Upon reviewing the egregious and inaccurate Equifax credit report concerning Plaintiff dated November 2, 2023, Plaintiff suffered emotional distress, embarrassment, inconvenience, anxiety, and fear of financial loss.

113.   Thus, Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Capital One Denies Plaintiff's Credit Application**
**(The Credit Bureau Defendants Merged/Mixed Plaintiff's Credit File into his Twin Brother's Credit File)**

114.   On or about January 26, 2024, Plaintiff applied for a credit card with Capital One.

115.   In order for Capital One to make a determination on Plaintiff's credit application, it would need to obtain copies of Plaintiff's credit files. Plaintiff provided Capital One with his personal identification information, including his Social Security number, and authorized it to obtain his credit files.

116.   Upon information and belief, on or about January 26, 2024, at least one of the Credit Bureau Defendants sold a consumer report about Plaintiff to Capital One in relation to Plaintiff's credit application.

117.   On or about January 26, 2024, Plaintiff received a notice from Capital One denying his credit application.

118.   Upon information and belief, Plaintiff was denied the Capital One credit card due to at least one of the Credit Bureau Defendants merging/mixing Plaintiff's credit file into his twin brother Mr. Lavantia Garrett's credit file; therefore, making it incorrectly appear that Plaintiff had no credit history or, in the alternative, a poor credit history.

119.   Plaintiff was shocked and dismayed at the credit denial because he knew he did not have a negative credit history.

120.   Upon information and belief Defendant at least one Credit Bureau Defendant merged/mixed Plaintiff's credit file into his twin brother Mr. Lavantia Garrett's credit file, and in doing so, included incorrect information about Plaintiff on his consumer report that at least one Credit Bureau Defendant sold to Capital One.

121.   The Credit Bureau Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Requested his Consumer File from Defendant Experian and
Defendant Trans Union Which Were Ignored**

122.   Upon information and belief, Plaintiff's credit file with Defendant Experian has been mixed/merged up until at least March 2024. Specifically, Defendant Experian maintained one credit file for both Plaintiff and Plaintiff's twin brother, Mr. Lavantia Garrett. In the alternative, Plaintiff's credit file with Experian

contained credit and or debt collection accounts, along with other personal information, which belongs to Plaintiff's twin brother, Mr. Lavantia Garrett.

123.   Upon information and belief, Plaintiff's credit file with Defendant Trans Union has been mixed/merged up until at least March 2024. Specifically, Defendant Trans Union maintained one credit file for both Plaintiff and Plaintiff's twin brother, Mr. Lavantia Garrett. In the alternative, Plaintiff's credit file with Trans Union contained credit and or debt collection accounts, along with other personal information, which belong to Plaintiff's twin brother, Mr. Lavantia Garrett.

124.   Plaintiff decided he needed to review his credit reports from Defendant Experian and Defendant Trans Union as well to determine whether his credit files with the credit bureaus were mixed/merged with that of Plaintiff's twin brother.

125.   On or about February 12, 2024, Plaintiff sent requests under 15 U.S.C. § 1681g for Plaintiff's full consumer file disclosure report to both Defendant Experian and Defendant Trans Union ("Disclosure Report Request").

126.   Plaintiff included, along with his Disclosure Report Request, a copy of his driver's license, a billing statement to establish proof of address and identity, a third-party authorization form, his social security number, his date of birth, and his address.

127.   On or about March 20, 2024, Defendant Experian received the Disclosure Report Request. As of the date hereof, Defendant Experian has failed to provide a consumer file disclosure report as required under 15 U.S.C. § 1681g.

128.   Defendant Experian violated 15 U.S.C. § 1681g by failing to provide Plaintiff with a full file disclosure report within a reasonable time of Plaintiff's request.

129.   Upon information and belief, Defendant Trans Union received the Disclosure Report Request. As of the date hereof, Defendant Trans Union has failed to provide a consumer file disclosure report as required under 15 U.S.C. § 1681g.

130.   Defendant Trans Union violated 15 U.S.C. § 1681g by failing to provide Plaintiff with a full file disclosure report within a reasonable time of Plaintiff's request.

**Plaintiff's February 2024 Disputes to the Credit Bureau Defendants**

131.   On or about February 15, 2024, worried that something was very wrong with his Equifax credit file, Plaintiff mailed a dispute letter to Defendant Equifax and disputed the Mixed Information appearing on the Equifax consumer report dated November 2, 2023 ("February 2024 Equifax Dispute").

132.   Along with his dispute letter, Plaintiff included a copy of his driver's license, social security card, and a billing statement to better assist Defendant Equifax in identifying him in its system. Plaintiff explained that the Mixed

Information belonged to his twin brother and asked Defendant Equifax to investigate and delete such Mixed Information.

133.    Despite the fact that Plaintiff submitted the necessary identifying documents, Defendant Equifax failed to respond to Plaintiff's February 2024 Equifax Dispute.

134.    Defendant failed to conduct a reasonable investigation of Plaintiff's February 2024 Equifax Dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

135.    On or about February 15, 2024, worried that something was very wrong with his Experian credit file, Plaintiff mailed a dispute letter to Defendant Experian, informing Defendant Experian that Plaintiff suspects it is mixing/merging his credit file with information belonging to his twin brother ("February 2024 Experian Dispute").

136.    Along with his dispute letter, Plaintiff included a copy of his driver's license, social security card, and a billing statement to better assist Defendant Experian in identifying him in its system. Plaintiff asked Defendant Experian to investigate his credit file and delete any information that does not belong to him.

137.   Despite the fact that Plaintiff submitted the necessary identifying documents, Defendant Experian failed to respond to Plaintiff's February 2024 Experian Dispute.

138.   Defendant failed to conduct a reasonable investigation of Plaintiff's February 2024 Experian Dispute, or any reinvestigation whatsoever, to determine whether Plaintiff's Experian credit file contained any inaccurate information and record the current status of any inaccurate information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

139.   On or about February 15, 2024, worried that something was very wrong with his Trans Union credit file, Plaintiff mailed a dispute letter to Defendant Trans Union, informing Defendant Trans Union that Plaintiff suspects it is mixing/merging his credit file with information belonging to his twin brother ("February 2024 Trans Union Dispute").

140.   Along with his dispute letter, Plaintiff included a copy of his driver's license, social security card, and a billing statement to better assist Defendant Trans Union in identifying him in its system. Plaintiff asked Defendant Trans Union to investigate his credit file and delete any information that does not belong to him.

141.   Despite the fact that Plaintiff submitted the necessary identifying documents, Defendant Trans Union failed to respond to Plaintiff's February 2024 Trans Union Dispute.

142.   Defendant failed to conduct a reasonable investigation of Plaintiff's February 2024 Trans Union Dispute, or any reinvestigation whatsoever, to determine whether Plaintiff's Trans Union credit file contained any inaccurate information and record the current status of any inaccurate information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

143.   Thereafter, and upon information and belief, the Credit Bureau Defendants failed to unmix Plaintiff's credit file from that of Plaintiff's twin brother and likely continued to report Plaintiff's twin brother's information to Plaintiff's credit file.

144.   The Credit Bureau Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it publishes and maintains concerning Plaintiff.

145.   Upon information and belief, because the Credit Bureau Defendants continued to mix Plaintiff's credit file with that of his twin brother, Defendant continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to his twin brother.

146.   As a result of the "mixed file," the Credit Bureau Defendants made it practically impossible for Plaintiff to obtain credit.

147.   Plaintiff feels like he does not exist from a credit standpoint, and his unable to obtain the credit he needs to move on with his life out of fear that he will

continuously get denied as a result of the Credit Bureau Defendants mixing/merging his credit file with that of his twin brother's.

148.   At all times pertinent hereto, each Credit Bureau Defendant was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the corresponding Credit Bureau Defendant herein.

149.   At all times pertinent hereto, each Credit Bureau Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

150.   The Credit Bureau Defendant are aware of the shortcomings of its procedures and intentionally choose not to comply with the FCRA to lower its costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

151.   As a result of each Credit Bureau Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money

disputing and trying to correct the inaccurate credit reporting, if any; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting, if any; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Each Credit Bureau Defendant)

152.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

153.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

154.   Upon information and belief, on at least one occasion, each Credit Bureau Defendant prepared patently false consumer reports concerning Plaintiff.

155.   Each Credit Bureau Defendant mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

156.   Each Credit Bureau Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

157.   As a result of each Credit Bureau Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting, if any; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting, if any; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

158.   Each Credit Bureau Defendant's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

159.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Each Credit Bureau Defendant)

160.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

161.   The FCRA mandates that each Credit Bureau Defendant conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id*.

162.   The FCRA provides that if a Credit Bureau Defendant conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed

information, it is required to delete the item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

163.   After each Credit Bureau Defendant ignored Plaintiff's request for a file disclosure report, Plaintiff initiated a dispute with each Defendant, asked each Credit Bureau Defendant to investigate and disputed any inaccurate information reporting.

164.   Each Credit Bureau Defendant failed to respond to Plaintiff's disputes and conducted *no* investigation of Plaintiff's disputes, or such investigations, if any, were so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

165.   Each Credit Bureau Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

166.   As a result of each Credit Bureau Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to

information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

167.   Each Credit Bureau Defendant's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, each Credit Bureau Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

168.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

//

//

**COUNT III**
**15 U.S.C. § 1681b(a)**
**Furnishing a Credit Report Without a Permissible Purpose**
**(Third Claim for Relief Against Each Credit Bureau Defendant)**

169.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

170.   This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

171.   Plaintiff is a "consumer" as defined by the FCRA.

172.   Each Credit Bureau Defendant is a consumer reporting agency that furnishes consumer reports as defined and contemplated by the FCRA.

173.   The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

174.   On multiple occasions, Defendant Equifax furnished Plaintiff's credit report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which Defendant Equifax therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

175.   Defendant Equifax violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer.

176.   Upon information and belief, on at least one occasion, both Defendant Experian and Defendant Trans Union furnished Plaintiff's credit report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which Defendant Experian and Defendant Trans Union therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

177.   Upon information and belief, Defendant Experian and Defendant Trans Union violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer.

178.   As a result of each Credit Bureau Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his

good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

179.   Each Credit Bureau Defendant's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, each Credit Bureau Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

180.   Plaintiff is entitled to recover attorneys' fees and costs from each Credit Bureau Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**15 U.S.C. § 1681g**
**Failure to Provide a Full Disclosure Report**
**(Fourth Claim for Relief Against Defendant Experian**
**and Defendant Trans Union)**

181.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

182.   15 U.S.C. § 1681g requires that consumer reporting agencies supply consumers with all information in their file at the time they make that request, including the source of such information.

183.   On or about February 12, 2024, Plaintiff, requested a copy of his consumer file from Defendant Experian in writing by certified mail.

184.   On or about March 20, 2024, Defendant Experian received Plaintiff's request for his consumer file.

185.   Thereafter, Defendant Experian failed to provide Plaintiff with a copy of her consumer file upon receiving Plaintiff's request.

186.   On or about February 12, 2024, Plaintiff, requested a copy of his consumer file from Defendant Trans Union in writing by certified mail.

187.   Upon information and belief, Defendant Trans Union received Plaintiff's request for his consumer file.

188.   Thereafter, upon information and belief, Defendant Trans Union failed to provide Plaintiff with a copy of her consumer file upon receiving Plaintiff's request.

189.   Accordingly, Defendant Experian and Defendant Trans Union are each individually liable to Plaintiff under § 1681g for failing to provide Plaintiff with the information in his consumer file and the source of such information upon receipt Plaintiff's request.

190.   As a result of Defendants' conduct, action and inaction, Plaintiff suffered actual damages which have been further described above.

191.   Defendant Experian's and Defendant Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant Experian's and Defendant Trans Union's were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

192.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Experian and Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that each Credit Bureau Defendant negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


RESPECTFULLY SUBMITTED this 9th day of January 2025,


**CONSUMER JUSTICE LAW FIRM**

By:*/s/ Catherine Tillman*
Catherine Tillman, Esq., FL #0057663
CONSUMER JUSTICE LAW FIRM
8095 N. 85th Way
Scottsdale, AZ 85258
T: (941) 263-7310
F: (480) 613-7733
E: ctillman@consumerjustice.com

*Attorneys for Plaintiff,*
*Brandon Travantia Garrett*